**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

MUNICIPALITY OF MAYAGÜEZ,

      **Plaintiff**

        **v.**

CORPORACIÓN PARA EL DESARROLLO
DEL OESTE,

      **Defendant**

CIVIL NO. 06-1467 (JAG)

**OPINION AND ORDER**

GARCIA-GREGORY, D.J.

    Before the Court is Plaintiff Municipality of Mayagüez's suit for breach of contract against Defendant Corporación Para el Desarrollo del Oeste. After a bench trial held from August 24, 2010 to September 2, 2010, the Court finds as follows.

**FACTUAL AND PROCEDURAL BACKGROUND**

    The Corporación Para el Desarrollo del Oeste (hereinafter "CPDO") was incorporated on November 6, 1978, with the purpose of promoting the development of the Northwestern and Southwestern regions of Puerto Rico. It was, at the time, a private nonprofit organization eligible to participate in the Community Development Block Grants (hereinafter "CDBG") program from the Department of Housing and Urban Development (hereinafter "HUD") as a Subrecipient. 24 C.F.R. § 570.500(c). The CDBG program was enacted by Congress to provide funds to

**Civil No.** 06-1467

local units of government to invest in the development of deteriorated urban areas in order to promote economic recovery and benefit low and moderate income persons. 42 U.S.C. § 5301.

The Municipality of Mayagüez (hereinafter "Mayagüez") participated in the CDBG program and the Urban Development Action Grants (hereinafter "UDAG") program as a grantee. The UDAG program, 42 U.S.C. § 5318, is akin to CDBG in its purpose, but not as restrictive in what is required of the grantee in terms of record keeping and administration of federal funds. As a grantee, Mayagüez was responsible for administering the funds received from HUD, and had the option of meeting program objectives through a subgrantee.

Using CDBG and UDAG funds, Mayagüez purchased several parcels of land in and around the city. The purchase, and subsequent transfer of these lands, took place from March 1980 through September 1984. On September 6, Mayagüez and CPDO signed a contract, Deed 91, (Joint Exhibit II), by which Mayagüez agreed to transfer certain parcels of land to CPDO, and CPDO, acting as subgrantee under CDBG, agreed to develop the lands in accordance with CDBG program objectives and regulations. The contract generally describes that CPDO is to develop the parcels into a project called Villa Sultanita, comprised of housing, commercial space, and related infrastructure. The contract was signed by the Honorable Benjamín Cole, Mayor of Mayagüez, and

**Civil No.** 06-1467

Mr. Luis Rodríguez, President of CPDO. Mayagüez gave CPDO the endorsements and support required for application of the various permits required to conduct building activities.

CPDO carried out different transactions with the ceded lands and contracted with different private investors in furtherance of the Villa Sultanita project. Construction and development went about apparently as planned, and in 1988 CPDO received a certificate of merit from HUD highlighting the corporation's achievements with the Villa Sultanita project. Exhibit A. On July 18, 1990, Mayagüez received a certificate of completion from HUD, certifying that the Villa Sultanita project had been successfully completed. Exhibit B.

On January 11, 1993, the Hon. José G. Rodríguez (hereinafter "Mayor") became Mayor of Mayagüez, after winning a contested primary election against the incumbent, Hon. Benjamin Cole. On February 1, 1994 the Mayor wrote a letter to CPDO by which he ordered CPDO to cease any and all transactions involving the transferred land and revoking all authorizations and endorsements of CPDO's development of the transferred land. Exhibit III. The reasons given by the Mayor were that CPDO was in violation of the Autonomous Municipalities Act, 21 L.P.R.A. § 4001 et, seq., and the citizens residing in and around Villa Sultanita had complained on various occasions that CPDO was not honoring its contractual obligations.

**Civil No.** 06-1467

On June 30, 1995, the Office of the Comptroller, of the Commonwealth of Puerto Rico issued an audit report (hereinafter "Comptroller's Report") that pointed out certain irregularities in CPDO's dealings with Mayagüez from 1986 to 1993. Exhibit 28.

On October 6, 1995 CPDO sued the Municipality of Mayagüez in the Superior Court of Puerto Rico requesting declaratory judgment, injunctive relief and damages against Mayagüez for the municipality's refusal to allow CPDO to continue work on land. Mayagüez countersued and a protracted and bearish litigation ensued, only for all parties to withdraw their claims nearly a decade later. During that time, and it seems that to this day, any effective communication between the parties was, to say the least, inexistent.

All the while, HUD remained in communication with Mayagüez. On April 25, 1997 Carmen Cabrera, then Director of HUD's Caribbean Office, (hereinafter "Cabrera") forwarded the Mayor a letter regarding a meeting she had held with Mrs. Nereida Falto de Cole, then President of CPDO. Exhibit E. According to the letter, the meeting was held at the request of CPDO to afford the corporation an opportunity to present to HUD its plans for the development of the remaining undeveloped land at the Villa Sultanita site. CPDO's plan required the exchange of land owned by CPDO and another tract owned by a Mr. Bechara, also present at the meeting. In the letter, Cabrera wrote to the Mayor that

**Civil No.** 06-1467

HUD found that CPDO's plan was consonant with the use of the land as described in Deed 91, that is, to develop the land for economic development and affordable housing activities. Exhibit E.

As also conveyed in the letter, Cabrera had advised CPDO that any decisions regarding the Villa Sultanita land required the participation and approval of the Municipality; she acknowledged however, that the Mayor did not participate in the meeting and instead agreed to receive a report on the discussions. Last but not least, in her letter to the Mayor, Cabrera suggests that Mayagüez and CPDO should come to an agreement to work on the undeveloped Villa Sultanita land, for the benefit of the Municipality of Mayagüez.  Exhibit E.

On July 1, 1997, the Office of the Inspector General of HUD issued an audit report titled "Municipality of Mayagüez Community Development Block Grant and Section 108 Loan Guarantee Assistance Programs" (hereinafter "HUD audit"). Exhibit I. The HUD audit was initially notified to Cabrera, and informed that after completing an audit of the Municipality of Mayagüez pertaining to its CDBG and related programs, serious deficiencies in the grantee's administration of HUD programs had been found. As the title suggests, the findings in the HUD audit describe irregularities by the grantee, Mayagüez. However, in but a few of the findings, the limelight is shared by Mayagüez

**Civil No.** 06-1467

and the subrecipient, CPDO. The HUD audit was also notified to Mayagüez shortly thereafter.

The HUD audit findings that pertained to CPDO are all directly related to the use that CPDO gave the land that was transferred to it by Mayagüez. Other than the successfully completed Villa Sultanita project, CPDO sold or otherwise received money for use of some of the remaining lands in the Villa Sultanita area. Some of these remaining lands were developed for projects that, according to the HUD audit, were apparently not in compliance with HUD program requirements, while others remained idle.

Specifically, finding 1-D referred to proceeds received by CPDO for lands sold and developed for buildings to house a police station and the State Insurance Fund Corporation. According to CDBG regulations, funds cannot be destined for the construction of buildings to carry out the general conduct of government. 24 C.F.R. § 570.703(l).

Finding 1-E described (1) several plots of land sold or optioned to private persons who carried activities for which eligibility was unknown;(2) other plots of land that remained unused, and;(3) most of the housing units from Villa Sultanita were not sold to low and moderate income families. The charge was that these activities might have not been in compliance with CDBG national objectives. 24 C.F.R. § 570.208.

**Civil No.** 06-1467

Finding 2-A is related to finding 1-E. Finding 2-A points out that the grantee did not account for income received from activities funded with CDBG or LGA funds. The income here refers to proceeds obtained by CPDO from the sale or lease of plots of land from the Villa Sultanita area described in finding 1-E, and others. HUD regulations require that the receipt and expenditure of program income be recorded as part of the financial transactions of the CDBG program. 24 C.F.R. § 570.504.

Finding 4-A identifies apparently unnecessary or duplicative charges for project designs that had already been drawn, or not carried out at all. This finding includes charges for the design of a baseball park, the duplicate charges for the design of Villa Sultanita and other residential and commercial areas. These unnecessary expenses were apparently due to poor planning. According to the HUD audit, the poor planning that led to these unnecessary expenditures was at odds with HUD regulations that make the grantee responsible for managing the day-to-day operations of grant and subgrant supported activities, to assure that performance goals are being achieved. 24 C.F.R. § 85.40.

In the following months, HUD and Mayagüez communicated several times over the course of action that Mayagüez would take in order to address the HUD audit findings. On August 21, 1997, The Mayor wrote Cabrera in response to the HUD audit. Exhibit 6.

**Civil No.** 06-1467

Instead of directly addressing the findings that are the subject of this case, the Mayor informs Cabrera that some of the reported deficiencies are the making of CPDO, and are the subject of the litigation that began in 1995 in the Superior Court of Puerto Rico. The Mayor thus asked Cabrera not to take any action against Mayagüez while court proceedings played out. Cabrera replied in a letter of unknown date to the Mayor, and agreed to suspend any action on the part of HUD until the litigation between CPDO and Mayagüez is resolved. Exhibit 7.

In May of 2004, CPDO and Mayagüez voluntarily dismissed their cross-claims and the Superior Court litigation came to an end. Shortly thereafter, on July 9, 2004 Cabrera wrote the Mayor, and required payment of $3,972,069, the resulting amount corresponding to findings 1-D, 1-E, 2-A and 4-A of the HUD audit, which were the findings that were disputed in state court. Exhibit 14. After several years of litigation and Mayagüez's failure to respond to HUD's continued requests for evidence to support the Municipality's contentions regarding the findings, HUD chimed the bell on Mayagüez. Id.

On December 10, 2004 a meeting was held between HUD personnel, among them Cabrera, and a consultant for Mayagüez named Joseph Harrison. Joseph Harrison was hired by the Department of Housing and Community Development of the Municipality of Mayagüez (hereinafter "Mayagüez Department of

**Civil No.** 06-1467

Housing") to aid Mayagüez in all HUD matters. Joseph Harrison (hereinafter "Harrison"), apparently reported directly to Edna Rodriguez, Director of Mayagüez Department of Housing. The meeting was held to discuss the options available to Mayagüez to resolve or sanitize the HUD audit findings.

Upon conclusion of the meeting, Harrison forwarded Edna Rodriguez a memo he wrote on what took place at the meeting. Exhibit F. Every open finding from the HUD audit related to CPDO is reported by Harrison in his memo, with a proposed course of action for each. According to Harrison, HUD's attitude towards Mayagüez was open, positive and amenable to Mayagüez. The result of the meeting was, generally speaking, a request for more information from HUD regarding the findings that pertained to CPDO. As he begins to address the findings that pertain to CPDO, Harrison stressed that in order to sanitize most of the findings, HUD emphasized is was necessary for Mayagüez to open a channel of communication with CPDO. Exhibit F.

As conveyed in Harrison's memo, HUD at that point was willing to resolve most findings if Mayagüez could provide information that HUD program objectives had been met and that proceeds derived from transactions assisted with program funds had been recorded and used towards eligible activities. The option required Mayagüez to engage CPDO in order to gather the necessary information, as recommended also by Harrison. But the

**Civil No.** 06-1467

decision to establish communication with CPDO was one of policy, and rested solely within the Mayor's discretion. Exhibit F.

Harrison's memo also described, albeit briefly, another option for Mayagüez to resolve the HUD audit findings, without having to address them, nor communicate with CPDO. The representatives for Mayagüez at the meeting proposed to substitute the questioned projects and funds by developing other projects paid for with local municipal funds that met CDBG criteria. According to Harrison's memo, Cabrera stated that the possibility could be assessed. Harrison's memo concludes with a table outlining the questioned amounts of CDBG funds per each audit finding, the possibility of salvaging each, the amounts that HUD had questioned Mayagüez for, and what entity held the information necessary to sanitize each finding. The table was prepared assuming that no information would be requested from CPDO. The table described the amounts of money per each finding that Mayagüez would be responsible for, if it opted to clean the findings by paying the sums or using other projects, instead of communicating with CPDO and addressing the findings with the information requested by HUD.

Shortly after the meeting, on December 20, 2004, Edna Rodriguez wrote a letter to the Mayor regarding the meeting held with HUD a few days earlier. Exhibit G. She indicated that Mayagüez would be permitted to sanitize the audit findings,

**Civil No.** 06-1467

without having to address CPDO or its actions. In order to pursue this option, Mayagüez was to present a development plan of future projects to be financed with local funds, which would comply with all CDBG program requirements. Attached to Edna Rodriguez's letter to the Mayor was Harrison's memo. Edna Rodriguez notes that the information contained in Harrison's memo is important for the Mayor to know, in order for him to make an informed decision on how to deal with the HUD audit findings.

It is unclear exactly when the final decision was made on the part of Mayagüez to "pay" HUD the disallowed funds with projects financed with municipal funds. On January 13, 2005, José R. Rivera, the new Director of HUD's Caribbean office (Cabrera had retired days earlier) wrote the Mayor regarding a meeting that had been held on December 30, 2004 between HUD and Mayagüez. Exhibit 16. In the letter, José Rivera confirms the agreement reached between HUD and Mayagüez on the meeting of December 30th, whereby Mayagüez would "pay" for the questioned funds with projects financed with local funds. Hence, from what the Court can gather from the testimonial and documentary evidence, Mayagüez's choice of method to "repay" the HUD funds was probably made at some point between December 20, 2004 and December 30, 2004.

**Civil No.** 06-1467

The HUD audit of Mayagüez was informed to the municipality in July of 1997; there had been no communication between Mayagüez and CPDO since 1994. HUD's repeated suggestions to Mayagüez to communicate with CPDO in order to address the HUD audit findings were ignored by Mayagüez. Mayagüez chose instead to embark on new developments paid out of its own pocket, rather than address the HUD audit findings by providing information on CPDO's undertakings as Mayagüez's subgrantee of HUD funds.

Mayagüez went on to develop the projects proposed to HUD to close the HUD audit findings. Four years and roughly $4,000,000 of expended municipal funds later, Jose R. Rivera wrote the Mayor on November 13, 2009 and informed that all HUD audit findings had been closed. Exhibit 27.

While Mayagüez was engaged in the development projects proposed to clean the HUD audit findings, it found time to bring suit against CPDO, on May 10, 2006, for breach of contract. Mayagüez seeks injunctive and declaratory relief, rescission of any and all agreements between the parties, and $10,000,000 in damages. After several procedural incidents, this case finally came to trial with one Plaintiff, Mayagüez, one Defendant, CPDO, and the breach of contract claim was reduced to what was called to attention in findings 1-D, 1-E, 2-A and 4-A of the HUD audit and whether CPDO was in compliance with the incorporation

**Civil No.** 06-1467

requirements of the Autonomous Municipalities Act. <u>21 L.P.R.A. §</u>
<u>4001</u>.

All throughout Pretrial and post-trial motion practice, the
parties violated the Local Rules of this District. Counsels'
behavior throughout the trial was a far cry from exemplary.
Constant interruptions, repeated late appearances, puerile
outbursts, frivolous arguments and childish bickering were the
order of the day. Courtesy and respect among members of the bar,
were absent.

The Court entered an order that this case would be taken
under advisement on November 16, 2010. (Docket No. 263).
However, at that time the record remained open as the Court
waited for Plaintiff to submit translations of a good part of
its exhibits. Approximately two months went by and Plaintiff
failed to submit the translations; the Court could wait no
longer. To this day, no translations have been submitted for
Plaintiff's exhibits 4-5, 22-26, and 29-32. In any case, the
Court notes that these untranslated exhibits do not affect the
reasoning or findings of the Court.

### APLICABLE STANDARD[1]

---

[1] The Court's jurisdiction is based on the reasoning of Magistrate Judge
Lopez's Report and Recommendation on Defendant's Motion to Dismiss, (Docket
No. 34), which the Court adopted without objection from either party. (Docket
No. 38). Since the cause of action before the court turns heavily upon
determining whether federal regulations, as incorporated into the contract
between the parties, were complied with, we are before the kind of federal
question jurisdiction where a state law claim presents an important federal

**Civil No.** 06-1467

Fed. R. Civ. P 52(a)(1)

Rule 52(a) of the Federal Rules of Civil Procedure is the Judge's guide for ruling on issues brought before the Court on a bench trial. It states, in relevant part: "In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon." Fed. R. Civ. P. 52(a)(1). The rule requires of the Judge to provide a "clearly marked roadmap that shows how he reached a decision" in the case. Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997). "All that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling." Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1058 (2nd Cir. 1992). The Judge is not compelled to address every factual contention and argumentative detail raised by the parties. The Rule requires no more than a thorough and well-reasoned opinion, which adequately states the facts found and the court's conclusions of law. Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1216 n. 3 (9th Cir.1979).

Breach of Contract Under Puerto Rico Law

"Under Puerto Rico law, if the terms of a contract are clear, leaving no doubt as to the intentions of the contracting parties, then the literal sense of the stipulations shall be

---

interest. Hence, jurisdiction is warranted. Smith v. Kansa City Title & Trust Co., 255 U.S. 180, 199 (1921).

**Civil No.** 06-1467

observed. 31 L.P.R.A. § 3471 (2010). The parties will be bound by their contractual obligations, which must be fulfilled in accordance with the agreement's terms. 31 L.P.R.A. § 2994 (2010)." First Bank Puerto Rico, Inc. v. Black Sea, M.V., 2011 WL 2134532 (D.P.R. 2011). "Under Puerto Rico law, the elements of a cause of action for breach of contract are: 1) a valid contract; and 2) a breach by one of the parties to the contract." Torres v. Bella Vista Hosp., Inc., 523 F.Supp.2d 123, 152 (D.P.R. 2007) (*citing* F.C. Imports, Inc. v. First Nat'l Bank of Boston, 816 F. Supp. 78, 93 (D.P.R. 1993)).

**DISCUSSION**

The Autonomous Municipalities Act

Whether CPDO was in compliance with the Autonomous Municipalities Act at the times relevant to this lawsuit is strictly a matter of law. Plaintiff contends that CPDO is in violation of the Autonomous Municipalities Act (hereinafter AMA) because it has not converted to a "special corporation" and has remained a non-profit corporation under the laws of Puerto Rico. In 1995 the AMA was amended and now provides that:

> Any nonprofit corporations created with the purpose of promoting the development of some aspect of a municipality in existence at the time this act becomes effective, and that have received or are receiving real or personal property, funds or annual donations,

> recurrent or not, from a municipality, shall avail itself to the provision of this subtitle to become special corporations… This conversion shall be initiated within a term of one hundred and twenty (120) days from the effectiveness date of this act.
>
> As of the date of enactment of this act, no municipality shall sponsor or patronize any nonprofit corporation to promote the development of any municipal public purpose, unless said corporation is constituted, organized, validated and operated according to the provisions of this subtitle.
>
> Any nonprofit corporation created under §§ 2601 et seq. of Title 14 to promote some municipal public purpose, *which is in operation on the effective date of this act, and that does not cho[o]se to avail itself of the provisions of this subtitle, may continue to operate exclusively under the legal regime of §§ 2601 et seq. of Title 14.*

21 L.P.R.A. § 4815

CPDO was formed as a non-profit corporation in 1978, and received funds and property from the Municipality of Mayagüez up to and until 1985. The amendment to the AMA requiring conversion of corporations receiving Municipal property into "special corporations" was passed in 1995; it had been years since CPDO

**Civil No.** 06-1467

received any property from Mayagüez. Given that it did not
solicit, receive nor was it likely to receive any property from
Mayagüez at any point after the 1995 amendment to the AMA, CPDO
had no obligation to convert. CPDO had the option of continuing
to operate as a non-profit corporation under 14 L.P.R.A. § 2601
and it chose to do so. 21 L.P.R.A. § 4815. CPDO is therefore not
in violation of the AMA.

Deed 91, federal regulations and the alleged breach

According to the evidence proffered by Plaintiff, the
contract between the parties is Deed 91. In it, Mayagüez
transfers to CPDO lands purchased with CDBG funds for CPDO, as
title holder by virtue of Deed 91, to develop into a residential
and commercial project called Villa Sultanita. Deed 91 commands
that the development of the lands shall be carried out in
compliance with "applicable state and federal laws and
regulations." Exhibit II. The breach of contract action now
before the Court is based on the findings of the HUD audit that
are the subject of recommendations 1-D, 1-E, 2-A and 4-A of the
audit. Joint Exhibit I.

The findings related to recommendation 1-D refer to the
construction and operation of the police station and the SIFC
building on the Villa Sultanita lands, in violation of 24 C.F.R.
§ 570.703(1), which commands that CDBG funds cannot be used on

**Civil No.** 06-1467

buildings for the general conduct of government. 24 C.F.R. §
570.703(l).

The findings related to recommendation 1-E titled "Land for
Automobile Parts Store Not Used", "Land Sold to Private Citizen
Not Supported", "Land In Option Status Not Supported" and "Land
For Housing Did Not Benefit Low/Moderate Residents". Exhibit I.
The HUD audit states that the activities carried out on these
parcels with CDBG funds do not advance program objectives, as
required by the CDBG program. The three CDBG national objectives
are: Benefiting Low- and Moderate-Income Persons; Preventing or
Eliminating Slums or Blight; and Meeting Urgent Needs. 24 C.F.R.
570.200(a)(2).

The "Land for Automobile Parts Store Not Used" finding
refers to an inspection conducted on site in October of 1996
which revealed that the auto part store was not operating.
Exhibit I, 6.

The "Land Sold to Private Citizen Not Supported" finding
refers to two plots of land totaling roughly 2,700 square meters
that were sold to private citizens at $10 per square meter. No
appraisals were conducted to determine the price of the land.
The finding was labeled as unsupported pending a final
eligibility determination from HUD. Exhibit I, 7.

The "Land In Option Status Not Supported" finding refers to
two lots optioned to two businesses for commercial operation.

**Civil No.** 06-1467

The finding points out that no records were kept of the use given to the lots, and no activities had been carried out. This finding was also pending a final determination by HUD. Exhibit I, 7.

The "Land For Housing Did Not Benefit Low/Moderate Residents" finding refers to the observation that homes in the Villa Sultanita development were sold to families whose incomes exceeded certain maximums. Hence, the sale of the homes did not benefit low/moderate income persons. However, this finding was also pending a final determination by HUD. Exhibit I, 8.

The findings related to recommendation 2-A, titled "Program Income Generated by the Subgrantee", refer to income derived by CPDO from the sale of plots of land in the Villa Sultanita area. Any income derived from the sale or use of lands purchased with CDGB funds is "program income" under HUD regulations. 24 C.F.R. § 570.500(a). "Program income" may be used for other activities that further CDBG national objectives. The recipient of HUD funds, Mayagüez, is obliged to record all "program income" and be able to account for it to HUD. 24 C.F.R. § 570.504. This finding points out that Mayagüez, "the grantee did not have any procedures to report or account for the program income generated by its subgrantee, CPDO." Exhibit I, 12.

The finding related to recommendation 4-A, "Unnecessary Charges Due to Poor Planning" refers to a payment of $86, 500

for blue prints for a baseball park that were not used,
duplicate payments for drawings of the Villa Sultanita project
in the amount of $22,000, and unnecessary expenditures for
engineering services related to the Villa Sultanita project in
the amount of $333,300. As per the HUD audit, the only
expenditure that mentions CPDO in this finding is the one for
unnecessary engineering services in the amount of $333, 300; the
other two payments were made directly by the grantee, Mayagüez.
This finding points to the grantee's duty of "managing the day
to day operations of grant and subgrant supported activities."
Exhibit I, 19-20. Indeed, according to CDBG regulations,
"[g]rantees must monitor grant and subgrant supported activities
to assure compliance with applicable Federal requirements and
that performance goals are being achieved. Grantee monitoring
must cover each program, function or activity." 24 C.F.R. §
85.40.

Testimony of Mayor Rodriguez

From the beginnings of his testimony, the Mayor made clear
his general opinion that the works carried out by CPDO on the
ceded lands, until the moment he issued the cease and desist
letter, did not comply with Deed 91. Mayor's Testimony 7-8,
8/26/2011. Shortly thereafter, to support his overview of the
whole matter, the Mayor mentioned the findings of the

**Civil No.** 06-1467

Comptroller's Report, (Exhibit 28), and an audit by a private firm, ordered by the Municipality. Mayor's Testimony 20-21.

Regarding finding 1-D of the HUD audit, specifically the construction of the police station and the recommendation to record the proceeds from the eminent domain, the Mayor stated that though it had been requested by the Municipality, they had not received the proceeds of the eminent domain carried out by the state over the land used to build the police station. He goes on to say that it was HUD personnel who indicated that the proceeds of the eminent domain "corresponded" to the Municipality, given that the building of the Police Station was not contemplated in Deed 91. Id. at 22-23. According to the Mayor, this later resulted in damages to the Municipality, given that HUD eventually ordered the Municipality to reimburse the proceeds of the eminent domain. Id. at 28-29.

The Court notes that the HUD audit, issued in July of 1997, only requires that proceeds from the eminent domain, and the land sold for the building of the SFIC, be recorded as program income. Exhibit I, 9. The order to reimburse came seven years later once HUD personnel had exhausted its patience, having had no response on the merits to the audit findings. Exhibit 14. The purported reimbursement later became part of the plan devised by the Municipality to sanitize the HUD audit findings by developing projects with municipal funds.

**Civil No.** 06-1467

The Mayor next commented on finding 1-E beginning with the land used for the NAPA auto parts store which was apparently not in operation in October 1996, and was thus not being used for the benefit of low/moderate income persons. Exhibit I, 6. The Mayor testified that the proceeds obtained from the sale of that land, $155,178, was part of the amount that the Municipality was later obliged to return to HUD. Mayor's Testimony 31, 8/26/2011. The Mayor testified likewise on the findings titled "Land In Option Status Not Supported", (Exhibit I, 7), and "Land For Housing Did Not Benefit Low/Moderate Income Residents", (Id. at 7-8), and that repayment of the funds related to these findings was required by HUD because the activities carried out there had also been found to be ineligible. Mayor's Testimony 34, 36, 8/26/2011. On the finding titled "Land Sold to Private Citizen Not Supported", (Exhibit I, 7), the Mayor testified that he knew of no authorization, written or otherwise, allowing CPDO to sell any of the ceded lands to private citizens. Mayor's Testimony 32-33, 8/26/2010.

The Mayor then made his initial comments on finding 2-A of the HUD audit, went briefly through each transaction listed in page 11 of the HUD audit, and testified that no authorization existed for CPDO to sell any of the ceded lands for the purposes therein listed. Id. at 36-43.

**Civil No.** 06-1467

Deed 91 gives Mayagüez the option to "participate in, and/or supervise" in any sale or transfer of the ceded lands. Exhibit II, p. 6. By virtue of Deed 91, title over the Villa Sultanita lands were transferred to CPDO. Hence, the corporation was legally authorized to sell or transfer the lands, as a matter of law. The only limit to this power was that the land was to be the site of the Villa Sultanita residential and commercial development, and that the works be carried out in compliance with applicable state and federal regulations. Id. at 5.

On the following day of trial, the Mayor commented for the first time during his testimony that at least since receiving the Comptroller's Report of June 1995, he never took it upon himself to address CPDO, or communicate with the corporation regarding the HUD audit. Mayor's Testimony 20, 8/27/2010. What the Mayor did do in August of 1994 once he thought that CDPO had violated Deed 91, but before he had received the HUD audit of 1997, or the Comptroller's Report of 1995, was revoke all permits and endorsements that had been granted to CPDO. Id. at 40-41. He then ordered an external audit of CPDO and eventually countersued the Corporation. Id. The Mayor failed to mention that even before August of 1994, he issued CPDO a cease and desist letter ordering the corporation to stop all development of the Deed 91 lands. Exhibit III. That cease and desist letter

**Civil No.** 06-1467

was sent by the Mayor in February of 1994, also before he had knowledge the Comptroller's Report or the HUD audit.

The Mayor then briefly refers to Exhibits 19 and 27. Both are letters from HUD to Mayagüez informing that the audit findings had been cleared. As the letters show, Mayagüez had complied with its proposal, earlier accepted by HUD, to "repay" the amounts questioned in the HUD audit findings by developing projects that complied with CDBG regulations using municipal funds. The projects carried out as repayment were valued at close to $4,000,000. Mayor's Testimony 42-43, 8/27/2010. The Mayor then commented on the damages caused to Mayagüez by this endeavor, for which the Municipality had to use municipal funds destined for other purposes, to carry out projects which might have otherwise been built with CDBG funds at little or no cost to Mayagüez. Id. at 48-49. The Mayor also testified that this "repayment plan" he felt compelled to undertake resulted in delays to other programed projects, damage to the reputation of the Municipality as administrator of public funds and the resulting difficulty in obtaining additional funds for other purposes. Id. at 51-5.

Finally, asked whether Mayagüez has ever requested CPDO to return any of the moneys or lands related to the HUD audit findings, the Mayor replied that that "has been the

**Civil No.** 06-1467

Municipalities [sic] chief claim towards the corporation." Id. at 75.

On cross-examination, the Mayor admitted that he ordered CPDO to stop all development of the Deed 91 lands despite the fact that at the point he sent the cease and desist letter on February 1, 1994, he did not yet know of the HUD audit, the Comptroller's Report, or an independent audit. Mayor's Testimony 43, 8/31/2010. The Mayor stated that he took his decision based on a transition report that he received when he came into power in 1993, which was not submitted as evidence, and on comments made by other political figures of the time regarding improper dealings between CPDO and the former municipal administration. Id. at 43. Though he initially testified that he notified the cease and desist letter to HUD, Id. at 34-35, he then testified that he did not recall, Id. at 36-37, and later admitted that he had not informed HUD of his suspicions of CPDO before the HUD audit. Id. at 46.

In fact, the first report the Mayor makes of conflicts between Mayagüez and CPDO to HUD are contained in the Municipality's preliminary reply to the HUD audit, by way of letter to Carmen Cabrera dated August 21, 1997. Exhibit 6. This preliminary reply does not directly address the findings, but instead informs HUD that the findings regarding CPDO are the subject of an ongoing lawsuit in PR State Court, and that HUD

**Civil No.** 06-1467

should wait for the outcome of the litigation before expecting action from the Municipality. Mayor's Testimony 51, 8/31/2011.

Regarding finding 1-D and the Police Station, the Mayor made commented regarding Mayagüez's initial comments to the HUD audit. Though the Mayor earlier testified that the proceeds received by CPDO from the eminent domain should be returned to the Municipality because it had been identified as an ineligible activity in the HUD audit, the auditee comments to the HUD audit by Mayagüez is that they believed the police station was an eligible activity under HUD regulations, in that the use of the funds benefitted low and moderate income persons, and that the income derived therefrom should be recorded in CPDO's books. Exhibit 6, 7. Mayor's Testimony 59-63. The Court notes that Mayagüez's comments to the HUD audit also state that Mayagüez believed the SFIC building was also an eligible activity under HUD regulations. Exhibit 6, 7. The Court also notes that, although he apparently did not have much choice, he endorsed the construction of the police station, carried out by the central government. Id. at 68. He, however, could not recall whether he conditioned the endorsement, or made any mention to the central government that the lands chosen for eminent domain were already part of a project to be developed with federal funds. Id. at 69-70.

**Civil No.** 06-1467

Asked why the Mayor conveyed in the auditee comments of 1997 that the money should be recorded by CPDO as program income, and now, he claimed that CPDO had to return the money to the Municipality, the Mayor gave a long and somewhat vague response on the record keeping duties of CPDO and the Municipality, but never squarely addressed the apparent inconsistency. Id. at 63-64, 72. The Mayor was then asked when exactly did HUD personnel ask the Municipality to return the CDBG funds that it had been granted, to which the Mayor responded that the request came about during a meeting, but he did not remember the year, (Id. at 65), or who it was at the meeting who made the request for the return of the funds. Id. at 68.

As mentioned earlier, the funds were actually requested by way of a letter from HUD to the Mayor, dated July 9, 2004. Exhibit 14. In that letter Carmen Cabrera stated, that although HUD initially deferred to the Municipality's request to not take any action until the state court litigation between the Municipality and CPDO concluded, ten years of litigation had gone by and HUD had received no formal, thorough response from Mayagüez addressing the findings. HUD could wait no longer, and decided to disallow all of the funds related to the findings, and requested repayment of the CDBG funds. Id. at 83.

**Civil No.** 06-1467

The Mayor acknowledged that Edna Rodriguez, head of Mayagüez's Housing Department, was one of the main officials in charge of dealing with the HUD audit, and was charged with reporting progress on this issue to the Mayor. Id. at 185-186. This responsibility Edna discharged through her letter of December 20, 2004, reporting on the meeting with HUD regarding the audit held around December 10, 2004. Exhibit G.

When initially asked about Joseph Harrison, the Mayor only stated that "I think he is an individual that works with federal issues." Id. at 91. The Mayor was then asked whether Mr. Harrison was authorized to meet with HUD officials regarding the HUD audit, to which he initially replied "he did not work directly with me." Id. at 95. Asked the same question a second time and the Mayor said no repeatedly. Id. He was vague and evasive in his responses on the matter of what options were available to the Municipality to address the HUD audit findings, as reported by Edna Rodriguez. Id. at 95-97. The Mayor testified that, although he received and read Edna Rodriguez's letter of December 20, 2004 regarding conversations with HUD on how to deal with the findings, (Exhibit G), he never saw or read Harrison's Memo. Id. at 109, 113, 114. The memo, (Exhibit F), is referred to as attached in Edna Rodriguez's letter to the Mayor: "Attached is the Report presented by Mr. Harrison from the meeting at HUD regarding the audit. At this meeting we went over

point by point each of the open findings and arrived at
conclusions regarding the possibility of sanitizing them and how
to do that." Exhibit G.

Though initially he seemed evasive when asked about the
matter, (Id. at 49), the Mayor later concedes that addressing
the findings was an option the Municipality had, but he stated
that the information was not available to exercise that option.
Id. at 98. He also refused to answer, at this point, whether it
was his decision to not address the HUD audit findings related
to CPDO, and claimed that communication between the Municipality
and CPDO had been cut off by CPDO when it filed suit against the
Municipality in October of 1995. Id. at 98-100. The Court notes
that the state court litigation to which the Mayor is referring
to in this line of testimony was voluntarily dismissed by both
parties in May of 2004. HUD's formal request for the CDBG funds
came in July of 2004, two months after the litigation had ended.
Exhibit 14.

Towards the end of his testimony, the Mayor continued to
seem reluctant to take responsibility for the decision, on the
part of Mayagüez, to "repay" the HUD funds by developing
projects financed with local municipal funds, instead of
addressing the HUD findings on the merits. He testified that he
did what was needed to protect Mayagüez, and stated that "any
alternative which would resolve the issue, that would not

**Civil No.** 06-1467

necessarily be using municipal funds to be able to cure that
issue, would have my support." Id. at 123-124. Asked then why
he did not choose to address the HUD audit findings on the
merits, he testified, among other things, that CPDO had failed
to accept or acknowledge that "the people of Mayagüez, in an
overwhelming majority, had democratically elected a new mayor
for the City of Mayagüez" and that if CPDO "wished to maintain
an acknowledging and respectful communication line to the
democratic power of the people of Mayagüez, the first thing they
would have needed to do, was to reach an approach with that new
Mayor of Mayagüez." Id. at 126-127. The Mayor was at no point
shy regarding his animosity, whether justified or not, towards
CPDO and earlier in his testimony had also balked at HUD's
suggestion to have CPDO complete a project left unfinished by
another developer. Mayor's Testimony 14-15, 8/31/2010.

At the end of his testimony, the Mayor again refused to
take ultimate responsibility for the choice of method to
sanitize the HUD findings, saying simply that "the decision to
opt for that plan it came up from the whole process, the
negotiations that occurred." Id. at 177. He reiterated that no
one ever discussed with him Harrison's memo, which relayed HUD's
statements that most of the findings could have been cleared
with information regarding the questioned projects. Id. at 184.
Though he earlier acknowledged that addressing the findings of

**Civil No.** 06-1467

the HUD audit on the merits was an option, among others, to deal with the questioned projects, he testified that the personnel that he had designated to deal with the HUD audit findings, never mentioned the option of addressing the findings on the merits as a genuinely viable one. He only stated that the option was possibly mentioned at some point. Id. at 184-185. This claims seems at odds with Edna Rodriguez's testimony, and her letter to the Mayor forwarding Harrison's memo, as well as with HUD's recommendations to Mayagüez to open a channel of communication with CPDO.

Finally, the Mayor testified that he did not remember anyone recommending to him that Mayagüez engage CPDO and attempt to communicate with the corporation. Id. at 118. This claim squarely contradicts the documentary evidence.

The Court did not afford much credibility to the testimony of Mayor Rodriguez.

Testimony of Edna Rodriguez Valentín

Edna Rodriguez, Director of Mayagüez housing Department, and one of the municipal officials in charge of dealing with HUD, testified that it was the Mayor who made the decision to repay HUD by developing other projects with local funds. Testimony of Edna Rodriguez 42, 9/1/2010. In fact, according to Edna Rodriguez, in the Mayor's view, it was the only option. Id. at 43.

**Civil No.** 06-1467

According to Edna Rodriguez, the opportunity never came to discuss with the Mayor the possibility of sanitizing the audit findings by addressing them on the merits. There were points in time when she attempted to bring up the subject of CPDO and the audit, but was told that the matter was being litigated, and thus no discussion was warranted while the case played out. Id. at 44. Later on, when she received Harrison's memo relaying HUD's recommendations to address the audit findings, as discussed in the meeting held between HUD and Mayagüez personnel, she did send a letter to the Mayor on December 20 of 2004, with Harrison's memo attached. Exhibit G. However, she found no time to discuss the issue with the Mayor in person due to the heavy workload at the Municipality during the days of mid-December before the Municipality closed for the holidays. Id. at 66-67. On the other hand, the plan to restore the CDBG funds with locally financed projects was clearly being discussed long before December of 2004. Id. at 71.

Though neither the Mayor nor Edna Rodriguez can accurately state who gave Harrison the authorization to meet with HUD personnel, it is clear that Harrison went to the meeting as a consultant hired by Mayagüez to deal with HUD and the audit findings. Id. at 78. Though Edna Rodriguez testified that she did not personally know the reasons for Harrison's presence at

**Civil No.** 06-1467

the meeting, it is also clear that he was present at the meeting. Id. at 79.

Finally, though the Mayor claims that he never saw Harrison's memo, Edna Rodriguez testified unequivocally that she "made the memo reach the Mayor", so that the Mayor could make the decision of whether to establish communication with CPDO in order to garner the information to address and perhaps even sanitize the HUD audit findings, or to go ahead with the option of using municipal funds to complete CDBG approved projects. Id. at 114.

The testimony of Edna Rodriguez is important when compared to the Mayor's testimony. Edna Rodriguez's statements cast serious doubt on the Mayor's repeated assertions that he was unaware of Harrison's memo, and his testimony that the option to address the findings on the merits was never discussed.

Testimony of Nereida Falto de Cole

The only witness for the Defendant was Nereida Falto de Cole, President of CPDO. A long time official of CPDO, Nereida has a long history of public service, working towards the development of housing for the disadvantaged,

The first thing the Court notes regarding the testimony of Nereida Falto is that despite the ongoing litigation between CPDO and Mayagüez, she attempted to establish communication with the Mayor on several occasions, (Testimony of Neredia Falto 33-

**Civil No.** 06-1467

34, 9/2/2011), starting shortly after the HUD audit, and as recently as a week before this trial. Id. at 74. Her phone calls were never returned. Id. at 36-37. At one point, Nereida and other CPDO personnel went to the Mayor's office to meet with him in person, in the hopes of working out a plan so the Mayor would revoke the cease and desist order and approve the remainder of CPDO's plans for the Deed 91 lands; the Mayor apparently greeted her at some point while she waited, but never met with her. Id. at 36. She squarely denies the claims that CPDO did not provide the Municipality with the information needed to address the HUD audit findings. Id. at 33.

Regarding finding 1-D and the police station, Nereida Falto testified that as soon as she learned of the central government's plan to expropriate a part of the lands conveyed to CPDO in Deed 91 for the construction of a police station, she communicated her opposition to the Mayor and the State Police. She conveyed to them that the police station should not be built on those lands because they were part of an area destined for commercial and residential development under the CDBG program. Id. at 43-44, 174-180. She then testified that the money CPDO received as a result of the eminent domain is still deposited in the bank, and there are plans to reinvest the money to buy land for the development of more affordable housing to substitute the

**Civil No.** 06-1467

units that were not built due to the construction of the police station. Id. at 44-47.

Regarding finding 1-D and the sale of the land for construction of the building for the SIFC, Nereida Falto stressed that this was an eligible activity under HUD national objectives. Id. at 47. A study was conducted by CPDO and it was concluded, not surprisingly, that the SIFC provides medical services to wage earners injured on the job who are normally not professionals, but people of low and moderate incomes; hence the determination that it was an eligible activity under CDBG regulations. Id. at 48, 51. It was also determined that the location was ideal for an SIFC site, whereas the old location did not have adequate facilities, or easy access for disabled persons. Id. at 49. The proceeds from the sale of that land are also deposited in a bank account. Id. at 50.

Regarding finding 1-E and the land used for the NAPA Auto Parts store, Nereida Falto also testified that, although it went out of business later, it was an eligible activity in that it provided jobs to low and moderate income persons. After the NAPA store, a bathroom supplies retailer took over the space, but left later as well, and now the site is home to a bakery called La Ricomini. La Ricomini, a well-known enterprise in Mayagüez, is not only still in business, and thus employing persons, but it addresses other needs of the surrounding community in that it

**Civil No.** 06-1467

provides the only place nearby where residents can buy basic food items. Id. at 54-55.

Regarding finding 1-E and the "Land Sold to Private Citizens Not Supported", (Exhibit I, 7), Nereida Falto testified that the land was sold to area residents whose homes were immediately adjacent to it and who were in need of expanding their small homes to, for example, construct additional dormitories to accommodate more family members. Id. at 55-56. The decision to sell the lands to these people, and at low prices and without previously conducting appraisals, was made because the plot was narrow and awkwardly located among terrain that made it impossible for CPDO to develop anything significant there. Thus, it was divided and sold to the residents who were, in practical terms, the only ones who could make meaningful use of those lands. Id. at 204.

Regarding finding 1-E and "Land in Option Status Not Supported",(Exhibit I, 7), though she testified she did not recall exactly what kind of business was operating in the questioned lands as of today, Nereida Falto affirmed that the lands were in use by businesses that had resulted in employment opportunities for low and moderate income persons of the surrounding community. Id. at 57-58.

Regarding 1-E and the 22.8 "cuerdas" of unused land, Nereida Falto testified that development of that portion of the

**Civil No.** 06-1467

Deed 91 lands had been halted since 1993. Id. at 58. She explained that no further work was carried out on those lands due to the fact that the Mayor, who took power in 1993, had refused to endorse any of CPDO's projects since he came in to office. Id. at 58. The documentary evidence also shows that development of those lands was made impossible at least since early 1994, when the Mayor revoked all endorsements previously issued to CPDO. Exhibit III.

Nereida Falto goes on to discuss finding 2-A and the requirement of recording income derived from activities carried out using CDBG funds, i.e. "program income". She was aware of the Municipality's duty to record program income under HUD regulations, 24 C.F.R. § 570, and of CPDO's duty, as a non-profit corporation, to report its expenditures to the government. She testified she would gladly assist the Municipality and provide the information necessary for it to carry out its recording duty to HUD, but there simply was no open relationship between the two entities. Id. at 60. According to Nereida Falto, all of the information on the transactions questioned in finding 2-A are available in CPDO's financial reports, which have also been audited by certified public accountants. Id. at 60. Plaintiff's Exhibit 29.

Regarding finding 4-A, Nereida Falto testified that the baseball park had been built by the Municipality of Mayagüez,

**Civil No.** 06-1467

and not by CPDO. Id. at 71. She gave no explanation as to the
duplicate blue prints for the Villa Sultanita project. At the
end of her testimony she did express being confused regarding
the fact that she was being questioned regarding finding 4-A,
about projects that were never under the control of CPDO,
particularly the baseball park. Id. at 228. Finally, regarding
the unused drawings for the Villa Sultanita project, for which
at $333,300 were spent, it is clear from the HUD audit that
these plans were never used because the design was ultimately
rendered useless due to the eminent domain and subsequent
construction of the police station at the site contemplated by
the blue prints. Exhibit I, 20.

Nereida Falto concluded her testimony on direct by stating
that HUD never gave CPDO any notice of the HUD audit of the
Municipality of Mayagüez, nor of any of the findings therein
that, according to the Defendant, are due to CPDO. Id. at 230.

On cross-examination[2] Plaintiff's counsel questioned Nereida
Falto on how and why the communications between Mayagüez and
CPDO broke down. Though she stated that she had not sent written
letters to the Mayor, she reiterated that CPDO was more than

---

[2] On cross, the bulk of Plaintiff's counsel's line of questioning was directed
at some of the findings of the Comptroller's Report and that, from an
accounting perspective, the strong ties between CPDO officials and the then
municipal administration from 1978 until 1993 may have posed conflicts of
interests. These findings are not conclusive as a matter of law and, more
importantly, entirely unrelated to the breach of contract action before the
court, which was limited to the findings related to recommendation 1-D, 1-E,
2-A and 4-A of the HUD Audit. (Docket No. 221).

**Civil No.** 06-1467

willing to communicate with the Municipality. Id. at 156-160.
Her earlier contentions that she called the Mayor on several
occasions but received no answer, and that she went to the
Mayor's office for a previously arranged meeting but was never
allowed to meet with the Mayor, remained unchallenged. Id. at
230.

Nereida Falto remained steadfast to her contention that at
all times CPDO has carried out its work in a legal and proper
manner, and that it is now, and has always been, more than
willing to communicate with the Municipality and to help address
all of HUD's concerns, but that CPDO has not been afforded the
opportunity to do so. Id. at 220-222.

Throughout the time that CPDO's work in Mayagüez has been
paralyzed, CPDO has continued cooperating with other
municipalities in the western region of Puerto Rico developing
projects using HUD funds. Id. at 64-66. Nereida Falto sustains
that CPDO has plans for the remaining unused lands in the area
designated in Deed 91, (e.g. Exhibit E), and that CPDO hopes to
carry out the remainder of its plans for those lands and set
aside its conflicts with the Municipality, so that CDPO can
dedicate its limited resources for the carrying out of the
corporation's raison d'etre. Id. at 72.

The Court found Nereida Falto's testimony reasonably
consistent and credible.

**Civil No.** 06-1467

Joseph Harrison's Memo

The subject of many evasive answers from the Plaintiff's witnesses, the memo of Joseph Harrison is key to understand the reason why this case has come before the Court as it has. It is undisputed that Joseph Harrison was a consultant hired by Mayagüez to deal with the HUD audit findings. It is also undisputed that shortly before or on December 10, 2004 he met with HUD personnel and discussed with them ways in which Mayagüez could possibly sanitize the audit findings, without the need to repay any money or carry out any construction projects. Plaintiff did not proffer any evidence to dispute the authenticity nor the contents of Harrison's memo. Though the mayor denied having seen, read or discussed Harrison's memo, he did acknowledge receipt of Edna Rodriguez's letter, which was sent and addressed to the Mayor with the memo attached and clearly referred to in the letter. The Court did not credit the Mayor's testimony regarding his ignorance of Harrison's memo.

According to Harrison's memo of the meeting, regarding finding 1-D, HUD requested information on what use was given to the proceeds CPDO received from the land used for the police station and the State Insurance fund Corporation, in order to determine if it was used for eligible purposes. These comments actually are more akin to finding 2-A, which is the finding that questions the lack of record keeping and the need to show the

**Civil No.** 06-1467

use of program income derived from the sale of various plots of land. Regarding the SIFC building particularly, he comments that HUD later determined that it was, after all, an eligible activity. Exhibit F, 3.

Regarding finding 1-E, and the "Land For Automobile Parts Store Not Used", HUD agreed to sanitize the finding if Mayagüez presented evidence that whatever business was operating there at the time, resulted in jobs for low/moderate income persons. Id. at 4. Regarding the "Land Sold to Private Citizen Not Supported", the lands were "located close to the river and could not be utilized…", so HUD merely asked to have the lots identified so that a determination could be made over the eligibility of the use given to the lands. Id. Regarding the "Land In Option Status Not Supported", HUD also only asked that the commercial areas be identified and whether the businesses therein resulted in jobs for low/moderate income persons. Id. at 4-5. Regarding the finding that the "Land For housing Did Not Benefit Low/moderate Income Persons" the memo states that, as discussed with HUD, HUD's Inspector General may have committed errors, speculated and may have used outdated information to arrive at the conclusions of this finding. HUD indicated that Mayagüez should further develop this issue in a written report so that HUD could make a final determination. Id. at 5. The memo also comments on the remaining unused lands in the Villa

**Civil No.** 06-1467

Sultanita area, for which CPDO had submitted plans for HUD's consideration, but these had been not approved by the Mayor. HUD indicated that it was necessary for Mayagüez and CPDO to meet to discuss this development plan and submit it for HUD's final approval. Id. at 5

Concerning the findings of recommendation 2-A, Harrison's memo only points out that it was necessary for Mayagüez to request information from CPDO regarding the use that was given to the proceeds received from the sale of lands transferred through Deed 91. Included in the finding are the proceeds derived from the eminent domain of the land used for the police station, the proceeds from the sale of the land for the SIFC building, the proceeds from the sale of the land for the auto parts store, the proceeds from the lots sold to private persons, and the proceeds from the lands optioned to businesses, among others. Id. at 5-6.

Finally, concerning finding 4-A, in order to sanitize the findings regarding the payments for engineering services and construction drawing plans that were due apparently to poor planning, it was suggested that Mayagüez could have identified whether the plans and designs that were paid for were amended and perhaps eventually used on other projects. Again, a simple request for information.

<u>Conclusion</u>

**Civil No.** 06-1467

Plaintiff's testimonial evidence is insufficient to persuade this Court that CPDO has violated Deed 91. The brunt of Plaintiff's testimonial evidence was the Mayor's testimony, which was marred by vague and evasive answers to crucial questions. The Mayor's testimony simply does not seem to conform to the picture painted by the documentary evidence. The Mayor seemed particularly evasive on the entire subject of Joseph Harrison, and his memo on the December 2004 meeting between HUD and Mayagüez personnel including Harrison. He brushed off questions regarding Harrison's hiring and duties, and vehemently denied ever having read or seen Harrison's memo. These statements were squarely contradicted by the testimony of Edna Rodriguez, who testified that she sent the Mayor a letter with the memo attached; the letter clearly made reference to the memo. Exhibit G. The Mayor often also made statements regarding HUD that seemed inconsistent with the documentary evidence. He described various findings as requests from HUD for Mayagüez to repay funds, when in reality, the audit findings did not require Mayagüez to pay a cent. An actual request for payment came after years of requests from HUD to Mayagüez to address the audit findings, only to hear Mayagüez's talismanic response that the issue was being litigated and no response could be given.

The Mayor's testimony is simply not consistent with the picture painted by the documentary evidence. On the other hand,

**Civil No.** 06-1467

what can be drawn from the Mayor's testimony, and to some extent from the documentary evidence as well, is that his feelings towards CPDO were not amicable.

The documentary evidence shows that shortly after he took power, and without having any knowledge of either the HUD audit or the Comptroller's report, the Mayor ordered CPDO to stop all construction on the Deed 91 lands in early 1994. Exhibit III. The documentary evidence shows that since before the HUD audit was issued, HUD was already suggesting to Mayagüez to communicate with CPDO to approve CPDO's plans for the remaining unused lands at Villa Sultanita. Exhibit E. The exhibits also show that HUD reiterated its suggestion to Mayagüez to communicate with CPDO to sort out the HUD findings on at least one more occasion. Exhibit F. Finally, the evidence shows that though HUD was exceedingly patient with Mayagüez and requested that Mayagüez address the HUD audit findings on several occasions, the plan had long been in the works, to not address the HUD audit findings and instead develop locally funded projects as repayment. Exhibits G & 16. That decision was taken once the state court litigation had ended in voluntary dismissal by both parties.

Mayagüez had the option to engage in communication with CPDO, and could have likely obtained information within the corporation's reach that would have potentially allowed them to

**Civil No.** 06-1467

sanitize the audit findings against it. Indeed, the very entity that Mayagüez was accountable to, HUD, suggested on more than one occasion to Mayagüez to opt for contacting CPDO for the required information. Mayagüez instead decided to embark on a costly and burdensome development endeavor that allowed it, for motives unknown to this Court, to clear the findings without ever having to address them on the merits.

The evidence does not show that there was any wrongdoing on the part of CPDO.

Regarding the findings referred to in recommendation 1-E, 24 C.F.R. § 570.208, provides a small sea of very specific guidelines[3] used to determine whether an activity financed by

---

[3]  (i) An activity, the benefits of which are available to all the residents in a particular area, where at least 51 percent of the residents are low and moderate income persons. …An activity that serves an area that is not primarily residential in character shall not qualify under this criterion.

(ii) For metropolitan cities and urban counties, an activity that would otherwise qualify under § 570.208(a)(1)(i), except that the area served contains less than 51 percent low- and moderate-income residents, will also be considered to meet the objective of benefiting low- and moderate-income persons where the proportion of such persons in the area is within the highest quartile of all areas in the recipient's jurisdiction in terms of the degree of concentration of such persons. …In applying this exception, HUD will determine the lowest proportion a recipient may use to qualify an area for this purpose, as follows:

(A)…
….
(D)…

(iii) An activity to develop, establish, and operate for up to two years after the establishment of, a uniform emergency telephone number system…

(A)…
….
(D)…

(iv) An activity for which the assistance to a public improvement that provides benefits to all the residents of an area is limited to paying special assessments…

….

**Civil No.** 06-1467

CDBG funds complies with at least one CBDG national objective. 24 C.F.R. § 570.208. The CDBG program national objectives are: Benefiting Low- and Moderate-Income Persons; Preventing or Eliminating Slums or Blight; and Meeting Urgent Needs. 24 C.F.R. 570.200(a)(2). Neither party has proffered evidence for the Court to determine whether the projects completed or underway by CPDO strictly comply with 24 C.F.R. 570.208. The Court then cannot speculate as to this, to the detriment of Plaintiff who has the burden of proof. We can take into account, however, HUD's own comments on the issue, as relayed in Harrison's memo. Most of the findings here simply required a showing that jobs had been created, or that the use of the lands had somehow benefited low and moderate income persons.

The findings referred to in recommendation 4-A are solely directed at the grantee, Mayagüez, as the entity which made the payments for the unused baseball park drawings and the duplicate payments for the Villa Sultanita drawings. Regarding the unnecessary $333,300 in engineering expenses, the audit itself offers the explanation: these were services rendered towards the planning for the lands that were subject to eminent domain and subsequent construction of the police station. Exhibit I, 20.

---

(vii)…

….

**Civil No.** 06-1467

Though Mayagüez itself had perhaps little say in this decision, CPDO certainly had none. In any case, this finding points to the duty of Mayagüez, as CDBG grantee, "to monitor grant and subgrant supported activities to assure compliance with applicable Federal requirements and that performance goals are being achieved." 24 C.F.R. § 85.40. Needless to say, Mayagüez, by refusing to engage CDPO in any sort of communication, neglected to comply with this responsibility, which was its alone.

Regarding the findings referred to in recommendation 1-D, that the police station and the SIFC site violated HUD regulations in that those are buildings destined for the general conduct of government, 24 C.F.R. § 570.703(1), the issue should likewise be settled. It is clear that it was not CPDO's decision to build a police station in the Villa Sultanita area. CPDO, through Nereida Falto, in fact openly opposed the idea and attempted to persuade the government to build the police station elsewhere, and leave untouched the plans already devised for the Villa Sultanita lands. The same goes for the SIFC building, for which HUD eventually recanted its original statement that it did not comply with CDBG national objectives, and later found that it actually was an eligible activity. Exhibit F.

Regarding the findings referred to in recommendation 2-A, the HUD audit points to the failure to record program income. 24

**Civil No.** 06-1467

C.F.R. § 570.704. The Court notes that this section of the CDBG regulations is directed, almost in its entirety at the recipient, not at the sub-recipient, as the party responsible for the recording requirements. Mayagüez could certainly not comply with this responsibility without communicating with HUD, which it chose not to do. Furthermore, the only subsection on recording requirements that even mentions the subrecipient is 24 C.F.R. § 570.504(c), which specifies certain stipulations that the written agreement between the recipient and the subrecipient must contain for the disposition of program income received by subrecipient. Subsection 570.504(c) refers in turn to 24 C.F.R § 570.503, which is the more general section on what is required in the written agreement between the recipient and the subrecipient. The Agreement here, Deed 91, does not seem to comply with section § 570.503, nor does it contain any provision for the handling of income received by the subrecipient. As per the language of § 570.503, it is the recipient, and not the subrecipient, who is charged with the responsibility to ascertain that the written agreement complies with these requirements. In any case, CPDO proffered during the trial that it kept yearly financial statements for its transactions, and rendered reports to the government on its expenditures, as it was obliged to do as a non-profit corporation. Hence CPDO had in

**Civil No.** 06-1467

place a method of recording whatever income it received or spent through its activities.

Furthermore, it appears that all of the findings of 2-A could have been sanitized with a simple proffer of information on what the program income was used for, in order for HUD to determine if they were used for eligible activities. This information Nereida Falto provided in part during trial, and stated that she would be more than happy to provide more details in order to account for the proper use of the funds.

Can it be known for certain whether every cent of CDBG funds related to this suit was used for proper purposes? Unlikely. We might have been able to answer this question had Mayagüez opted to comply with its ultimate responsibility as steward of the CDBG funds, followed repeated recommendations to communicate with CPDO, and investigated the matter thoroughly. It is truly an irony that Mayagüez would have perhaps made a better case had it chosen to communicate with CPDO to obtain information on the use of the CDBG funds; it might have then actually discovered some mismanagement, if any existed at all. But it went on a much more burdensome path, and chose to cast no more light on the matter than that provided by a provisional audit only tangentially related to CPDO that is now, in a way, moot. Exhibit 19 & 27.  Less we forget the title of the HUD

**Civil No.** 06-1467

audit: "*Municipality of Mayagüez* CDBG and 108 Loan Assistance Guarantee Programs." The emphasis is the Court's own.

What Mayagüez decided not to do is actually more telling than most of the evidence it has proffered to this Court. Perhaps Mayagüez's chosen course of action not to address the HUD audit findings directly by engaging CPDO, was due to its suspicion that it would find no foul play at all. What is certain is that Plaintiff has not proffered sufficient evidence to show a breach of contract by Defendant based on improper use of CDBG funds.

**CONCLUSION**

For the reasons stated above, the Court finds that there has been no breach of contract. Plaintiff's claims are therefore dismissed. Judgment shall be entered accordingly.


IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of September 2011.


S/Jay A. Garcia-Gregory<br>
JAY A. GARCIA-GREGORY<br>
United States District Judge